## Mount Pleasant Coal Company, Appellant, v. Delaware, Lackawanna and Western Railroad Company.

*Railroad—Right of way—Agreement with landowner—Overhead bridge—Coal land.*

Where a railroad company secures by an agreement with the owner and not by the exercise of the right of eminent domain, a right of way over a farm underlaid with coal, and it appears by the terms of the deed that the right of way is limited to a two-track railroad, and it also appears that the value of the coal was known to both parties at the time of the deed, that the farm was severed by the right of way, and that by the acts of the parties in erecting fences, walls and buildings, the lines of the right of way were fixed and remained so for a long period of time, the railroad company cannot prevent the owner of the land from erecting an overhead bridge across the right of way which will not interfere with the operation of the railroad, and which is intended to be used for taking coal from one part of the land to the other, and is in substitution of a coal trestle which is to be taken down and abandoned.

All contracts made by a railroad company with the landowner whereby privileges are wholly or in part obtained, without condemnation are favorably regarded by the courts, and are construed strongly in favor of the owner.

*Railroads —Overhead crossing—Act of April* 16, 1838, *P. L.* 464.

The Act of April 16, 1838, P. L. 464, which provides that no person shall construct an overhead crossing over a railroad without the permission of the railroad company, was aimed at wilful trespassers, and does not apply to a person who has granted by deed to a railroad company a right of way across his land, reserving all the coal under the land both outside and beneath the tracks, and containing a plain assertion of intent by the owner to enjoy to the full his property as a coal property.

Argued Feb. 22, 1900.    Appeal, No. 43, Jan. T., 1900, by plaintiff, from decree of C. P. Lackawanna Co., Nov. T., 1899, No. 4, on bill in equity in case of Mount Pleasant Coal Company v. Delaware, Lackawanna and Western Railroad Company. Before GREEN, P. J., McCOLLUM, MITCHELL, DEAN and FELL, JJ.    Reversed.

Bill in equity for an injunction.

ARCHIBALD, P. J., reported the facts as follows :

This is a bill to restrain the defendant company from interfering with the building across its right of way of an overhead bridge or structure for the conveying of coal from the plaintiff's breaker on one side of the railroad to pockets to be erected on the other.

FACTS.

1. The Mount Pleasant Coal Company, plaintiff in the bill, is a corporation organized under the general corporation laws of Pennsylvania for the purpose of mining, preparing for market and selling anthracite coal; and is the lessee and owner of all the coal underlying a certain tract of land in the city of Scranton containing some 227 acres formerly belonging to William Swetland and know as the William Swetland tract, together with certain surface rights and privileges to be used and exercised in connection with the mining of the said coal ; under and in pursuance of which said lease the said company is engaged in the business of mining the said coal from the said tract and preparing and shipping it to market.

2. The Delaware, Lackawanna and Western Railroad Company, the defendant in the bill, is a public corporation formed by the consolidation of certain others specially incorporated by sundry acts of the state of Pennsylvania, beginning in 1832 and concluding in 1856 ; and owns and operates a steam locomo-

tive passenger, freight and coal railroad running through the city of Scranton, the eastern terminus of its main line being at Hoboken, New Jersey, and the western terminus at Buffalo, New York.

3. On January 23, 1854, William Swetland, the then owner of the said coal tract, by deed duly executed and recorded, granted and conveyed to the defendant company, its successors and assigns, "for the purposes of its railroad," a strip of land across the said tract described as "about fifty perches in length occupied by the grade, track and survey of the railroad of said company, and six perches in width, said railroad survey being in the center of said strip of land, with such additional width as the necessary slopes of excavation and embankment may in case of the construction of a double track require. This strip of land being only intended to be employed for right of way for the railroad of said company. To have and to hold the said piece or parcel of land unto said company and their successors and assigns so long as the same shall be by them required for railroad purposes." This deed appears in full as exhibit "A" attached to the plaintiff's bill and as there set forth is made a part of the findings in the case without further recital herein. At the time this deed was executed the strip of land there described was occupied by what is now the west or south-bound track of the defendant company. Since then two other tracks have been located upon it to the east of the original one, the first of these being the north or west-bound track in 1871, and the other a siding for general purposes in 1882.

4. Superficially the right of way of the railroad divides the William Swetland tract into two parts, the easterly, lying between the railroad and the Lackawanna river, containing about forty acres, and the other lying west of the railroad, containing about 187 acres. On the latter is located the shaft, breaker building, engines, boilers, breaker machinery, screens, scales, and scale house, and other mining fixtures and improvements of the plaintiff company necessary for mining the coal beneath the tract, hoisting it to the surface, and breaking, screening and preparing it for market. The breaker building is located close to the railroad, its most easterly foundation being but eight feet and the structure itself about twelve or fifteen feet from the westerly rail of the south-bound track, and a switch,

extends from that track under the structure of the breaker on which coal cars are run below the coal pockets to be there filled with prepared coal for transshipment to market.

5. The surface of that part of the tract lying east of the railroad is used by the plaintiff company as a dumping ground, for the culm and refuse necessarily made in the process of mining, breaking, screening and preparing the coal, and is the only place where the same can be conveniently dumped or deposited, and access to it is had by means of an overhead wooden trestle and bridge proceeding from the breaker and extending across the defendant's railroad at an elevation of about twenty-two feet. The bridge crosses the tracks about twenty-five feet below or to the southwest of the breaker; it is constructed of wood and supported on wooden beams or bents resting on stone foundations and has a span across the tracks of the railroad of about forty-six feet; it is twenty-five feet wide and carries two narrow gauge mine tracks, one to convey the culm from the breaker to the dump and the other to return the empty cars to the breaker again; the loaded cars are shifted by means of a small mine locomotive engine and the empty cars returned to the breaker by gravity.

6. The appearance and relative location of the breaker, the railroad tracks and the bridge and culm dump are as shown in the photographs, plaintiff's exhibits 14 to 20 inclusive, which are adopted and made a part of the findings in the case supplementary to and explanatory of what is herein set forth.

7. The defendant railroad has never taken into its possession nor occupied the full width of the right of way granted to it across this track by William Swetland in 1854, and the mine fixtures of the plaintiff company directly and materially encroach upon the said right of way; but this has been with the acquiescence and consent of the said railroad, the relations between it and the several parties who from time to time have owned and operated the mines on this property being most intimate.

(*a*) The coal was originally leased December 15, 1854, for the term of ten years from April 1, 1863, by William Swetland to Lewis and Howells, who within the next year sank a slope to the coal and erected a small breaker on the property; the mouth of the slope was about where the top of the present

shaft is and the breaker practically in the same location as the one now in use at the distance of twelve or fifteen feet from the single railroad track then laid. Four years later, or about 1859, a bridge, similar in character and construction to the one now extending over the railroad and at about the same location with it, was built across from the breaker to the easterly half of the surface of the track which was specially set aside as a dumping ground for culm and refuse from the mines.

(*b*) In 1871 the property passed into the possession of a Massachusetts corporation known as the Mount Pleasant Coal Company, but in no way connected with the plaintiff company, who obtained a further lease of it for ten years from April 1, 1873. About this time the second track of the railroad company was laid and the bridge or trestle was correspondingly lengthened. Three years later, in 1874, the coal company built a new and larger breaker on the site of the old one, the plans being made by John F. Snyder, chief mining engineer of the Delaware, Lackawanna and Western Railroad Company. This breaker, to meet certain internal arrangements, was extended entirely over the two railroad tracks then existing, its extreme easterly foundation being on the east of them, and engines and trains on these two main tracks running under the building for a distance of about one hundred feet as through a tunnel. At the same time the culm trestle was taken down and a new one built diagonally across the railroad somewhat higher above it than before, with two tracks upon it instead of one as on the old one.

(*c*) In 1877 the Mount Pleasant Coal Company was sold out and the lease of the coal forfeited to the lessors, who the same year executed to William T. Smith a new lease to run until April 1, 1893, and this lease in December, 1884, was still further extended and made perpetual until all the coal in and upon the tract should be exhausted. Later, about 1890, a perpendicular shaft was sunk to the coal and the slope abandoned, a change which required a remodeling of the breaker; the part overhanging and bridging the railroad tracks was accordingly taken down and the building confined to the westerly side of the railroad the same as it now stands; the bridge or culm trestle was also overhauled, and the one which is now in use constructed. In the mean time, in the fall of 1882, the

third track was laid by the railroad company. To do this one bent of the culm trestle which was in the way and the pier on which it rested had to be removed, and the culm dump on the easterly side had to be cleared away to the extent of about twelve or fourteen feet before the track could be laid.

(d) During all this period the coal mined from the property, except that which was sold for domestic use, has been sold and delivered by the various parties operating the tract to the Delaware, Lackawanna and Western Railroad Company, the defendant in the bill, on sundry written agreements regulating the quantities to be delivered and the prices to be paid therefor. The last of these was executed July 29, 1892, and was to continue in force until January 1, 1900, the minimum annual quantity agreed to be delivered and taken thereby being 170,000 tons.

8. These were the existing conditions when the present Mount Pleasant Coal Company, on November 28, 1898, became the owner of the property in question, since which time it has continued to carry out the contract with the railroad company for the sale and delivery of the coal which it has mined. Dissatisfied, however, with the way in which the contract was being carried out on the part of the railroad company, on July 12, 1899, the said Mount Pleasant Coal Company made a new contract with the New York, Ontario and Western Railroad Company, also a coal carrying road, for the transportation by it to tide water of all the coal to be mined from the said land. The railroad of the said New York, Ontario and Western Railroad Company also traverses the Swetland tract, but at its extreme easterly end and at a much lower level along the bank of the Lackawanna river. In order to connect the Mount Pleasant breaker with it, it is proposed to build a switch about 3,000 feet long, starting at a point a little above the breaker and on the opposite side of the Delaware, Lackawanna and Western Railroad from it and circling around the culm dump and running down at a grade of about three and one half feet to the hundred, to unite with it at a point on its main line near the river. It is further proposed, as part of the same plan, to build coal pockets at the upper end of this switch just opposite the breaker under which the cars of the said railroad company will be run and from which they will be loaded with coal; and as a neces-

sary adjunct to this the coal must in some way be conveyed from the breaker on one side to the pockets on the other across the tracks of the defendant railroad.

9. To effect this the following plan has been devised:

(a) It is proposed to build an overhead Howe truss wooden bridge or structure stretching across the tracks at the height of at least twenty-seven feet and extending in width the whole front of the breaker some ninety-six feet up and down the railroad. It was at first intended to support this bridge on the side of the breaker by a bent of timbers resting on the present easterly stone foundation of the breaker building eight feet from the most westerly rail of the railroad, and on the other side by a similar bent resting on a foundation to be built fifty-five feet from the other, but as these abutments would fall within the right of way claimed by the railroad under the Swetland deed, the offer was made at the trial to lengthen the span to such distance as the court might direct in order that this should be avoided.

(b) On this bridge is to be constructed a system of eleven belt conveyors of the best quality of rubber belting—nine of them twelve inches wide, one eighteen inches, and one twenty-four inches—running over moving pulleys by which they are to be kept in place, and put in motion; these belts will move at the rate of 200 feet a minute and the coal from the breaker falling loosely upon them and being kept in place by the sagging of the belts, will be conveyed across and dumped off without more into the pockets on the other side; each belt will run in a separate compartment which will be sided and boarded over and in, and the bottom of the bridge will be tightly closed with tongued and grooved boards, and then sheathed with sheet iron or copper to prevent danger of fire from sparks thrown out by passing locomotives. The same precaution by sheathing will be taken as to the rest of the structure if deemed necessary by the court.

(c) The proposed bridge is not to be connected in any way with the present culm trestle, which at its nearest point is fifteen feet away from where the other is to be set up, and upon the erection of the new structure, the culm trestle will be torn down and abandoned, the culm being conveyed over by a belt in one of the compartments the same as the prepared coal.

(d) The proposed structure for all practical purposes will be a safe one; built on the Howe truss plan, the span can be lengthened out to 100 feet and even further, without any difficulty; taking the capacity of the breaker at 120 tons an hour and the speed at which the belts will travel at 200 feet a minute, the weight of the coal upon the structure at any one time will not exceed ten tons; and the compartments in which the coal is to be conveyed being boxed in there will be no opportunity for any of it to get out and fall upon the tracks or passing trains beneath, in which respect it would be a great improvement on the present bridge which is open and unprotected; further, if the ends are built so as to rest upon substantial stone piers or abutments at least fifteen feet from the nearest rail, all anticipated danger of the supports being knocked from under it by a derailed engine or train running into them would be removed. The only menace to the railroad would be from a fire starting in the breaker and communicating to the bridge, and the debris falling down upon the tracks and blocking them, but the destruction of the breaker by fire as it now stands but twelve or fifteen feet from the nearest rail would result in practically the same thing, and the extension of the bridge would not materially increase this danger. As to the sparks from passing engines the structure, if properly covered or sheathed, with iron or copper, would be sufficiently protected.

10. The capacity of the mines and breaker of the plaintiff company is 120 tons an hour, or 1,200 tons a day, amounting to 300,000 or 350,000 tons a year. Although the mines have been operated steadily for over forty years there are still about 3,000,000 tons of merchantable coal on the property, the great bulk of which is on the westerly side of the railroad. It is also estimated that there are some 700,000 tons of the smallest sizes in the culm or refuse dump, which in the present and prospective condition of the trade can be screened and marketed. The best veins, however, have been worked out and the coal which remains requires to be mined according to the most approved and economical methods in order to be profitable. The proposed overhead structure with its system of belt conveyers is in line with this and is necessary for the full and profitable working and enjoyment of the tract as a coal property. Without it the company is practically confined in the sale and trans-

portation of its coal to such arrangements as it may be able to make with the Delaware, Lackawanna and Western Railroad only.

11. In June, 1899, prior to making the contract with the New York, Ontario and Western Railroad, E. L. Fuller, president of the plaintiff company, met W. H. Truesdale, president of the defendant company, and stated that his company desired to build an overhead bridge across the tracks of the railroad such as has been described, and asked permission to construct on the railroad right of way, in such a manner, however, as would not interfere with its traffic, the necessary preliminary false work in order to do so. He explained by a sketch the proposed system of conveyors and the characters of the construction, just where it was to be put up, its dimensions, purposes, etc., and offered to construct it if so desired under the supervision and in accordance with the views of the railroad company's engineers. It was conceded at the time that this was for the purpose of shipping the coal produced at the breaker by the New York and Ontario railroad. Mr. Truesdale declined to allow the construction, either of the false work or the proposed bridge, and announced that the company intended to hold the coal and not let it go to another road. He asked if the Mount Pleasant people were not satisfied with their treatment; to which Mr. Fuller replied that they were not, and that on the contrary they were very much dissatisfied; that the railroad company had not lived up to the terms of its contract and had discriminated in favor of other operators, refusing to furnish cars to the Mount Pleasant Company for anything like the tonnage agreed to be taken under the contract, for which statement he gave facts and figures, apparently convincing Mr. Truesdale of its truth. Several interviews of similar character were had afterwards, but without favorable result. Both parties consulted legal counsel and the railroad company being advised that the crossing could not be made without its consent declined to allow the construction and the present bill was filed. Mr. Truesdale subsequently notified the Mount Pleasant Coal Company by letter to take down the existing culm trestle or bridge and remove the breaker from off the limits of the right of way, giving them until January 1, 1900, to do so.

The court entered a decree dismissing the bill.

*Error assigned* was the decree of the court.

*D. T. Watson*, with him *Alfred Hand* and *William J. Hand*, for appellant.—The grant was limited merely to the easement of a right of way for two tracks. The grant is to be construed in favor of the grantor: Jackson v. Hathaway, 15 Johnson, 447; Sanderson v. Haverstick, 8 Pa. 294; Hasson v. Oil Creek, etc., R. R. Co., 8 Phila. 556; Lyon v. Gormley, 53 Pa. 263; Western Pa. R. R. Co. v. Johnson, 59 Pa. 290; Vermilya v. Chicago, etc., Ry. Co., 66 Ia. 606; Lance's App., 55 Pa. 16; Pittsburg & Lake Erie R. R. Co. v. Bruce, 102 Pa. 23; Dobbins v. Brown, 12 Pa. 80: Elliott on Railroads, sec. 1138; N. Y., etc., R. R. Co. v. Railway Comrs., 162 Mass. 81; Smith v. N. Y., etc., R. R. Co. 63 N. Y. 58; Gulf, etc., R. R. Co. v. Rowland, 70 Tex. 298.

The act of 1838 cannot apply to this case: Junction R. R. Co. v. Boyd, 8 Phila. 224.

Our overhead bridge, as proposed and as found by the judge below, is a proper exercise of our rights, if we have any right: Harvey v. Thomas, 10 Watts, 65; Hays v. Risher, 32 Pa. 169; Chartiers Block Coal Co. v. Mellon, 152 Pa. 286; Dand v. Kings Cote, 6 M. &. W. 174; Parks v. Bishop, 120 Mass. 340; Dubbs v. Phila. & Read. R. R. Co., 148 Pa. 66; Warren v. Columbus, etc., R. R. Co., 39 Ohio, 70; Fort Wayne, etc., R. R. Co. v. Sherry, 126 Ind. 335.

When a strip of land is conveyed from the middle of a parcel leaving the remainder in two separate tracts, a right of way from one to the other is implied independently of any statute securing such right: N. Y., etc., R. R. Co. v. Railroad Comrs., 162 Mass. 81; Smith v. N. Y., etc., R. R. Co., 63 N. Y. 58; Gulf, etc., R. R. Co. v. Rowland, 70 Tex. 298; 3 Elliott on Railroads, sec. 1140.

As Swetland and the railroad company did the acts under the Swetland deed, it definitely shows, inter alia, the eastern and western boundary lines of the right of way: Kraut's Appeal, 71 Pa. 64; Warner v. Columbus, etc., R. R. Co., 39 Ohio, 70 Gass's Appeal, 73 Pa. 39; Dist. of Columbia v. Gallaher, 124 U. S. 510; Colder v. Weaver, 7 Watts, 466; Chicago v. Sheldon, 9 Wallace, 50; Wilson v. Fenimore, 3 Cent. Repr. 538; Huckestein v. Nunnery Hill Inc. Plane Co., 173 Pa. 169.

It would be inequitable and unjust and contrary to fair dealing to allow the railroad company, in 1900, to blockade the coal company and prevent it from mining in the most economical manner the advancing age suggests, and transporting to market by the cheapest and readiest route and in the greatest volume possible, its coal, merely because by so doing the railroad company might lose some tonnage : Pennsylvania R. R. Co. v. The Glenwood & Dravosburg Electric St. Ry. Co., 184 Pa. 227.

As to our right to cross we cite the cases of New York & R. R. Co. v. R. R. Commissioners, 162 Mass. 81; Dobbins v. Brown, 12 Pa. 75; Searle v. Lackawanna R. & R. R. Co., 33 Pa. 57; Jones v. Seligman, 81 N. Y. 190; Wademan v. Albany & R. R. Co., 51 N. Y. 568; Hasson v. Oil Creek & Allegheny River R. R. Co., 8 Phila. 556; Stevenson v. Stewart, 7 Phila. 293; Patterson v. Phila., etc., R. R. Co., 26 W. N. C. 327; Gerrish v. Shattuck, 132 Mass. 235 ; Port v. Huntingdon, etc., R. R. Co., 168 Pa. 19; Collins v. Prentice, 15 Conn. 39; Turner v. Reynolds, 23 Pa. 199; Williams v. Gibson, 84 Ala. 228; United Land Co. v. Great Eastern Ry. Co., L. R. 10 Chan. App. Cases, 586 ; Whittier v. Winkley, 62 N. H. 338.

*Everett Warren,* of *Willard, Warren & Knapp,* for appellee.— Our position is that the title the defendant acquired by the Swetland deed, gave them the same right to the land it conveyed as though they had taken the same by condemnation proceedings under the right of eminent domain : Elliott on Railroads, section 937 ; Cairo, etc., Ry. Co. v. Brevoort, 62 Fed. Repr. 129; Pittsburg & Lake Erie R. R. Co. v. Bruce, 10 Am. & Eng. R. R. Cases, 1; Kansas Central Ry. Co. v. Allen, 22 Kan. 203; Brainard v. Clapp, 64 Mass. 7; Hazen v. Boston & R. R. Co., 68 Mass. 580; Hayden v. Skillings, 78 Maine, 413; Jackson v. Rutland & Burlington R. R. Co., 25 Vt. 150 ; Connecticut & R. R. Co. v. Holton, 32 Vt. 43; Troy & Railroad Co. v. Potter, 42 Vt. 272; Junction R. R. Co. v. Boyd, 8 Phila. 226; Penna. Schuylkill Valley R. R. Co. v. Reading Paper Mills, 149 Pa. 20 ; Pittsburg, etc., R. R. Co. v. Peet, 152 Pa. 488; Reading City v. Davis, 153 Pa. 360; Philadelphia v. Ward, 174 Pa. 45 ; Northern Cent. Ry. Co. v. Harrisburg & Electric Ry. Co., 177 Pa. 142; Speese v. Schuylkill River East Side R. R. Co., 8 Pa. Dist. Rep. 584.

The act which the plaintiff is now attempting is expressly prohibited by law: Act of April 16, 1838, P. L. 464; Downing v. McFadden, 18 Pa. 334.

OPINION BY MR. JUSTICE DEAN, October 11, 1901:

This is a bill to restrain defendant from interfering with the erection and use by plaintiff of an overhead bridge, crossing over defendant's railroad tracks, at plaintiff's colliery.

Plaintiff is a coal operator and carries on the business of mining and marketing anthracite coal, at Scranton, under a lease of 225 acres of coal, from the executors of William Swetland. Besides the coal under the lease, plaintiff owns forty years' accumulation of culm on the surface from former mining operations.

Plaintiff enjoyed a right of way by a bridge over defendant's tracks, from 1859, down to the present. William Swetland, the lessor's testator, owned in his lifetime the whole tract, coal and surface, except about four acres, belonging to Lucilla Silkman, which not long after the death of Swetland, she conveyed to his heirs and representatives, and which was included in the mining property, in 1871. Swetland had, on January 23, 1854, granted to the railroad company a right of way through the tract in these words:

"Doth hereby grant, bargain and sell unto the Delaware, Lackawanna & Western Railroad Company, their successors, representatives and assigns, the following lot or piece of land, for the purpose of the railroad of said company, the same being in Providence township, Luzerne county, . . . . bounded and described as follows: Northerly by land of Delaware, Lackawanna & Western Railroad Company, late Lucilla S. Silkman; southerly by land of Sylbanus Fellows, or Joseph Fellows, being a strip of land about fifty perches in length, occupied by the grade, track and survey of the said railroad company, and six perches in width; said railroad survey being in center of said strip of land, with such additional width as the necessary slopes of excavation and embankment may, in case of construction of a double track, require. This strip of land being only intended to be employed for right of way for the railroad of said company."

Then, these are the words of the habendum: " The said piece

or parcel of land unto said company, and their successors and assigns, so long as the same shall be by them required for railroad purposes, it being, however, understood and agreed, that good and sufficient fences, wherever the same are, or as they may become necessary, shall be made and maintained by and at the expense of said company."

It appeared that Swetland, before and up to the time of this grant, had maintained and used a private way, to pass from the upper to the lower part of the tract; when the character of the tract was changed from a farm to coal mining land, the use of this way was abandoned. When in existence it crossed the Silkman four acres of surface, and was used by the public as well as by Swetland, the latter then commencing and continuing to use an overhead bridge for purposes of communication between the two parts of his severed farm.

The charter of defendant, Act of April 7, 1832, P. L. 327, enacts thus:

" That whenever the said railroad shall cross any private laid out road or highway, or shall divide the grounds of any person into two parts so as to require bridges over it, the said president and managers shall be at liberty to build bridges, to be rendered practicable and fit for the passage of carts and wagons; and the breadth of such bridge shall be, if a bridge on a private road, or on the premises of an individual, or individuals, at least twelve feet on the tread or floor, and to repair the same, or erect and make new in place thereof."

The first lease of the coal was made by Swetland, in 1854, to Lewis & Howell. This lease expired on April 1, 1873, but with an option to renew the contract for a new term. Therefore, in view of the expiration of the lease on April 1, 1873, Swetland having died, his executor, on July 19, 1871, reciting that the interests of Lewis & Howell had become vested in the executor and the Mount Pleasant Coal Company, a new lease of the coal was made to the company for a term of ten years. Successive term leases were made until the last one, under which the plaintiff is now operating; it is for all the coal in the tract, or until the coal is exhausted. The possible value of plaintiff's grant is, that although the tract has been mined for forty years, there still remains 3,500,000 tons yet to be mined, under its lease, besides 750,000 tons of coal yet in the culm banks.

. During the whole period, from 1854, in which the mine has been operated, the coal mined has been sold and delivered to defendant, the Delaware, Lackawanna and Western Railroad Company, until July 12, 1899, when plaintiff made a contract with the New York, Ontario and Western Railroad Company, for the sale and delivery of its entire product to that company. This railroad also runs through the same tract of land.   To facilitate, or make possible, the delivery of coal to the latter company, the plaintiff proposes to build a Howe truss bridge over defendant's railroad, about fifteen feet distant from the present trestle over the same track which has been there since the mining of coal commenced.   On the completion of the new structure, the old one will be entirely removed.

The court below finds as a fact, to use its own words: " The proposed structure, for all practical purposes, will be a safe one."

This new structure defendant threatens to prevent by force. Plaintiff seeks by this bill to have it enjoined.   The learned judge of the court below refused an injunction and dismissed the bill; hence this appeal by plaintiff.

In reviewing the case, we do not think it would profit either side were we to follow court and counsel by discussing specifically forty-three special findings of fact, sixteen conclusions of law and thirty assignments of error, argued at length.   In our opinion, the issue turns on an interpretation of Swetland's deed of January 23, 1854, to the defendant company.   The rights of both parties hinge on that deed; whatever they might have been at law, if defendant were there, by right of eminent domain, it would be fruitless to discuss, for it cannot be questioned, defendant entered under a contract with Swetland, the owner of the land, with no appropriation then or since of any portion by right of eminent domain.   When the entry was made in 1854, the land was farm and coal land.   Although no mining had yet been done, because of lack of transportation facilities, its quality and great value as coal land were well known to both parties.   Defendant desired to cross it.   This brought the two parties together, the owner of the coal land and the railroad company, and they made a contract, the material part of which we have quoted.   Swetland says he hereby grants to the railroad company, " the following lot or piece of land for

the purposes of the railroad of said company." This company was, under its charter, a miner and owner of coal land, as well as a shipper and carrier of coal. The grant is to the company in its business as a carrier and for no other purpose authorized by its charter. It then goes on to say: "Being a strip of land about fifty perches in length, occupied by the grade, track and survey of the railroad of said company, and six perches in width, said survey being in the center of said strip of land, with such additional width as the necessary slopes of excavation and embankment may, in the case of a double track, require. This strip of land being only intended to be employed for right of way for the railroad of said company."

It is obvious, neither the length nor the width of the strip had been measured; both were estimated, as appears from the use of the word "about;" the right granted was, however, in the center, which was then occupied by one track, with such additional land, without regard to width, as might thereafter be necessary for two tracks; it was not for the general purposes of a railroad company, such as a shifting or distributing yard, as seems to be intimated by defendant, but is expressly restricted to a "right of way" purpose in the center of the strip; by the words used, the manifest intention of both parties being a right over the land for two tracks, whereon the company could lay its rails and run its cars. It was intended by this deed to convey a strip of land through the tract, supposed to be about fifty perches across, but if more than this, nevertheless, the right to cross was certain; the rails were to be laid in the center of the strip; for two tracks, the company was not restricted to the grade track and survey, but might widen out, as the necessities of slopes, excavations and embankments might require. Mills on Eminent Domain, section 110, says: "All contracts made by the condemning party with owner, whereby privileges are wholly or in part obtained, without condemnation, are favorably regarded by the courts and are construed strongly in favor of the owner." So to the same effect is Lewis on Eminent Domain, sections 289, 290, 298. This is the rule of interpretation of such contracts with the owner. And this interpretation of the deed was put upon it by the defendant immediately after its delivery, by most significant acts. It was bound to erect fences; it constructed one on the

eastern boundary of the right of way, exactly on the line of what would be sufficient for a double track, and just where plaintiff claims the boundary is indicated by the description in the deed; part of the fence is still standing, as testified by witnesses.

Further, Swetland laid out part of the surface in lots, one of which, containing an acre, he conveyed by deed, in 1863, to one Finch; the boundary on one side is the railroad; before he got his deed, about 1855, he entered upon the land and erected a foundation for a machine shop, which is still standing and is in a direct line with the fence. Again, a bridge was erected over the rails, called the Swetland street bridge, the eastern abutment of which is on a line with the fence; the same with the eastern abutment of the culm bridge, which is on the same line. Further, the original slope to mine the coal, sunk as early as 1855, was within fifteen feet of the railroad track, on the west side, the track remaining as it was then. The shaft for mining coal, the breakers for preparing it for market, and many other facts, all occurring during defendant's occupation of the land, show, that both the grantor and grantee, put the same construction on the deed as that now claimed by plaintiff. The facts stated are not of a doubtful character; they are clearly established; there is but one inference from them, and that, that defendant for forty-five years misinterpreted its deed, or is now, under the stress of litigation, giving its grant a wider scope than its language and the surroundings at the date of it warrant. If this deed were obscure, or ambiguous, the conduct of the parties to it for nearly half a century would be conclusive as to their intention. We can scarcely call the language ambiguous; the only uncertainty that can be alleged, arises from the neglect to make exact measurements; but, then they restrict the grant by the most exact words indicative of the purpose,—"It is only to be employed for right of way for the railroad of said company."

The learned judge of the court below gives no weight to these facts as showing the assertion of a right on part of plaintiff and acquiescence therein by defendant, but is of opinion, that on account of the friendly relations subsisting between them, the intrusions or trespasses were submitted to. We cannot so regard them. They were distinct assertions of a right, hostile

to the claim now made, and utterly at variance with any other than a mere right of possession in defendant for the purpose of a roadbed; in substance, its acts were repeated admissions by defendant of plaintiff's claim to the land, except for two tracks. Our observation is, that if there be any right of which railroad companies are jealous, it is of their right of way; it is rarely that they suffer such trespasses, if they be, in fact, trespasses, as is claimed to be shown by this evidence. We have repeatedly said, that what the parties mutually did and assented to under a contract, was an almost certain indication of its true meaning; not what they said as to its meaning after performance on each side, but what they did without objection while in the course of performance. In Republic Iron Works v. Burgwin, 139 Pa. 439, a case involving the construction of an agreement between heirs with reference to a tract of coal land, the present Chief Justice McCollum says: "For nearly fifty years the parties and their successors in title have occupied and used the property in conformity with this construction of the decree. It is a construction which gives effect to the obvious intention of the parties, and is consistent with the terms of the grant when read in the light of the circumstances and conditions affecting the subject of it." Every word of which can be aptly applied to this contract and the conduct of the parties under it.

As before adverted to, the defendant's right of way rests on a contract with the owner of the surface and coal; that the operator shall be able to work profitably the mines and ship over another railroad, an overhead bridge is necessary to supersede the present coal trestle, which latter is to be taken down and, in the language of the learned judge of the court below, "By this change the danger will be actually decreased instead of increased." Then as another fact he finds: "Such bridge will not interfere with the operation of defendant's railroad across the William Swetland tract, upon their right of way, as they have occupied it from the time the first track was built down to the present time." If the proposed structure does not intrude on their right of way, if it is not dangerous and in no way interferes with the operation of defendant's railroad, why should they be forcibly prevented from erecting such bridge? The court says: "I consider the proposed overhead structure as reasonably necessary to the full and complete enjoyment of this

property, under the lease which the plaintiff holds." But he then decides that, " Regardless of the manner in which the right of way was acquired, or the width to which the defendant company may be now entitled, the plaintiff company, without the consent of the railroad company, cannot cross it with an overhead structure such as is proposed," and this because of the prohibition of the Act of April 16, 1838, P. L. 464. We are clearly of the opinion, that the learned judge of the court below, misinterpreted this act, or rather misapplied it to the facts of this case. By the 11th section of this act it is provided that no person shall construct, among other things, any crossing place on the ground set apart for, or belonging to that forming part of the banks or excavation of any railroad, without permission in writing from the railroad company ; and further, that if any person should commence, or make any such construction, without such consent, he should forfeit or pay not exceeding $100, and that the railroad company might, at his expense, remove and destroy such structure. Obviously, this act was aimed at the wilful trespasser and was intended to guard the right of way from unauthorized intrusion. It is penal in its nature and invests the railroad company with the right not only to prosecute to punishment a wrong, but also with despotic powers to the extent of destruction of valuable property. But it never was intended to define the rights and powers vested in a railroad company, under a deed from its grantor ; rights under a contract, of which neither we nor the legislature could deprive either party. Here is a most valuable tract of coal land, containing several million tons of marketable coal, cut in two by a railroad. For the complete enjoyment of this property, it is necessary, that the owner shall cross the right of way by an overhead bridge or structure. The railroad company had no right there at all, unless such right was granted by the sovereign, the commonwealth, or by the owner ; it chose to accept a right by contract with the owner who, for railroad purposes, gave to it a narrow strip, for the consideration of $20.00. The extent of this grant is carefully limited to but the one purpose ; it reserves all the coal, both outside and beneath the tracks ; it is a plain assertion of intent by the owner to enjoy to the full his property as a coal property. The railroad company is as fully a party to that contract as the owner ; the right

of either or both to contract could not be abridged by the legislature in the absence of any public policy demanding restriction or prohibition. No public policy in this case called for the interference of the legislature; therefore, the act of 1838 has no application; it was intended to reach an entirely different sort of a case. We cannot, without disregarding the most familiar principles of equity, sustain defendant's claim. It has under its charter an irrepealable authority to own, mine, sell and buy coal and coal lands; in addition, it has all the rights of a common carrier railroad; it ought not to be permitted to stretch its legal authority in the latter capacity, to prevent a rival coal operator from the full enjoyment of his property, and a competing railroad from facilities for shipping.

The whole argument of appellee's able counsel, and the authorities cited to sustain it, is, in substance, based on the appropriation of land by a railroad company under a right of eminent domain. While we do not discuss this theory, neither will we here undertake to deny it. What would have been our opinion had defendant appeared before us, claiming to hold under such an appropriation, is not intimated now. We only concede, there is a wide distinction in the extent of the rights.

It is further argued by appellee's counsel, that although the court below expressly based its decision on a construction of the penal act of 1838, yet, on other grounds, not expressly stated, its decree should be sustained. But on our interpretation of the deed, the conduct of the parties for forty years under it, and the findings of fact by the court below, compel the defendants to rest their right of entry on the deed; if that right be not enlarged, or rather, the plaintiff's, circumscribed by the act of 1838, defendant has no authority to prevent the erection of the proposed structure. It can stand on no other ground than the deed, and yet by implication claim that its footing is made secure by the act of 1838. This ground as we have shown, is utterly insecure and crumbles when tested.

The decree of the court below is reversed, and it is ordered that the bill be reinstated; and the record is remitted to the court below and it is directed that an injunction issue, to accord with this opinion, and restrain defendant.

Further, as written agreements were filed, and offers in open court made by plaintiff as to details of the plans of construc-

tion and the use to be made thereof, to obviate objections made by defendant, the plaintiff should be directed to strictly conform to its agreements and offers made during the progress of the hearing. The decree in full can be better made by the court below than by us, as it can call in the assistance of counsel on both sides.

It is further ordered that defendant pay the costs.